## W. E. HEDGER CO., Inc., v. UNITED STATES.

District Court, S. D. New York.

March 31, 1930.

Single & Single and Horace T. Atkins, all of New York City, for petitioner.

Charles H. Tuttle, U. S. Atty., and Arthur H. Longfellow, both of New York City, for respondent.

GODDARD, District Judge.

This is a suit under the Tucker Act to recover damages alleged to have been sustained by W. E. Hedger Company, Inc., as a result of breach of contract of sale by the government to the Hedger Company of the tug Ballenas. The Ballenas was one of a number of vessels which the government had for disposal after the war. The United States Shipping Board advertised for bids, and its advertisement contained the following clauses:

"Particulars and planograph drawings will be furnished prospective buyers free of charge. Detailed plans are on file and may be examined, or sets of detailed plans, if desired, will be furnished at cost of reproductions. Vessels may be inspected upon application. * * * Vessels * * * sold will be 'as is, where is' at date of sale and without warranty or guaranty as to seaworthiness, condition, description, capacity or tonnage. Offers may stipulate right of bottom inspection on dry dock at risk and expense of bidder upon terms contained in Standard Proposal Form."

The Hedger Company, some months before, had bought the tug Barryton from the government for use in its towing business on the Great Lakes and was interested in buying another tug, and upon its request the representative of the Shipping Board furnished the Hedger Company with a list of the vessels which it was offering for sale, and a catalogue containing photographs and further details of some sixteen vessels of a similar design. The list contained the name of the vessel, the builder, the date when built, and her present location. Included in this list was the Barryton, which had been sold to the Hedger Company, and the tug Ballenas, and the catalogue stated that they were sister vessels. Before the names of the tugs Barryton and Ballenas, and others, appeared an asterisk, and at the bottom of the list there was a notation to the effect that the tugs before which the asterisk appeared are "equipped with towing engine," and the catalogue stated that the Ballenas is one of five of the tugs "equipped with towing engine." The Ballenas was at Jones Point, N. Y., and the Hedger Company, without inspecting her and apparently relying on the statement that she was a sister ship to the Barryton, which they bought, on November 6, 1925 submitted on the form provided by the Shipping Board, an

554

offer to purchase the Ballenas for $42,000. This written offer contained the following clauses:

"This offer is made in accordance with your advertisement, all terms of which are deemed to be incorporated herein. * * * In making our bid for the purchase of the above-mentioned tug 'as is, where is,' etc., we fully understand the condition of her bottom plates, etc."

On November 16, 1925, the Hedger Company was advised that this bid had been accepted by the Shipping Board subject to approval of its financial responsibility. Subsequently, the financial responsibility of the Hedger Company was approved, and on December 5, 1925, title of the Ballenas was conveyed to the Hedger Company by bill of sale, which contained the following clause:

"The United States of America * * * has bargained and sold, and by these presents do bargain and sell, unto the said W. E. Hedger Company, Inc., its successors and assigns, all the right, title and interest of the United States of America in and to the said steamtug Ballenas 'as is, where is' together with all her engines, boilers, machinery. * * * "

The physical delivery of the tug took place on Sunday, December 6, 1925, at Jones Point, N. Y. Then, for the first time, the Hedger Company's representative inspected the tug and discovered that she was not equipped with a towing engine. On the day following, Monday, Mr. Hedger telephoned to the Division of Ship Sales at Washington and informed them that the Ballenas was not equipped with a towing engine as he had been informed from the list and catalogue furnished to him by the Shipping Board.

The respondent concedes that the Ballenas was not equipped with a towing engine, but contends that it is relieved from furnishing one by reason of the words "as is, where is," appearing in the formal bid submitted by the petitioner and in the bill of sale; and the question in the case is whether such provision excused the respondent from supplying the tug with a towing engine. The significance of the words "as is, where is," seems to be free from doubt and to refer to the condition of the article sold. The phrase qualifies the state in which it shall be delivered. The identity of the article sold is fixed; condition only is uncertain.

In Shepherd v. Kain, 5 Barn. & Ald. 240, 106 Eng. Repr. 1180, an early case and one that has been cited frequently, it appears that in an advertisement for the sale of a vessel she was described as a "copper-fastened vessel," and it was stated that the "vessel, with her stores, as she now lies, to be taken with all faults, without allowance for any defects whatever"; that the vessel was only partially copper-fastened and was not what was called in the trade a copper-fastened vessel; that before the plaintiff bought her, he had opportunity to examine her. Upon suit being brought for breach of the warranty as to the character of the ship, a jury rendered a directed verdict for the plaintiff. Upon appeal the Kings Bench Division affirmed the judgment, and said:

"The meaning of the advertisement must be, that the seller will not be responsible for any faults which a copper-fastened ship may have. Suppose a silver service sold 'with all faults' and it turns out to be plated; can there be any doubt that the vendor would be liable? 'With all faults' must mean with all faults which it may have consistently with its being the thing described. Here the ship was not a copper-fastened ship at all; and therefore, the verdict was right."

In Whitney v. Boardman, 118 Mass. 242, it appeared that thirty-seven bales of Cawnpore buffalo hides had been sold to be taken with "all faults" except for sea damage only, if any, for which a fair allowance is to be made. The buyer refused to accept them as it was found that they were not Cawnpore hides. The court, referring to the phrase "with faults" said:

"Its meaning is such faults or defects as the article sold might have, retaining still its character and identity as the article described."

See also Peters v. Planner, [1895] 11 T. L. R. 169; Schwartz v. Kohn (Sup.) 155 N. Y. S. 547.

Respondent has cited a number of cases, but they do not seem to me to be in point for the following reasons:

In Mottram v. United States, 271 U. S. 15, 46 S. Ct. 386, 387, 70 L. Ed. 803, a lot of surplus military supplies were auctioned off and the amount was grossly overstated in the advertisement; it was held that the buyer could not recover as the catalogue contained a warning that the sales were to be held subject to errors of description and were to be made without any warranty. The auctioneer had stated before the bid was made that he would not guarantee any quantity. The buyer had inspected the lot as requested in the announcement of sale should be done, and the court said:

"It was obvious that the amount stated in the catalogue was erroneous and enormously in excess of that on hand."

In United States v. Atlanta Wrecking Co. (D. C.) 8 F.(2d) 542, surplus war supplies were advertised and sold at auction. The advertisement stated that the property listed for sale "will be sold 'as is' and 'where is,' without warranty or guaranty as to quality, character, condition * * * and no claim for any allowance upon any of the grounds aforesaid will be considered." Prospective buyers were asked to examine the property prior to the sale. At the sale two tent poles were exhibited with the statement that they were samples of the goods being offered. These poles were in sound condition. After the sale, the purchaser examined the lot purchased by him and found them in a damaged condition. It was held that he could not recover because they were not up to the standard of the sample. The difference between that case and the one at bar is that in that instance the property sold was delivered, but "as is" in accordance with the advertisement, while in the case at bar the towing engine was not delivered at all. The other cases cited by counsel for respondent also disclose facts which differ from those in the case at bar.

■■ Counsel for respondent also urges that even if the Shipping Board had breached the contract by its failure to deliver the tug equipped with a towing engine, any breach was waived by the buyer in signing the certificate of delivery on December 7, 1925, to the effect that "vessel is receipted for as having been delivered in accordance with Agreement of Sale." But what actually occurred indicates clearly that the Hedger Company did not intend to and did not waive their claim for the towing engine; for, on Sunday, December 6th, when the Ballenas was delivered to the Hedger Company, Mr. Hedger called the attention of the custodian of the tug to the absence of the engine, and on Monday, December 7th, the day the receipt was signed, he telephoned to the Ship Sales Division in Washington and notified them that the engine was lacking. And on December 10th, the Hedger Company wrote to the Ship Sales Division again calling its attention to the situation and that the bid was made with the understanding that there was a towing engine on the Ballenas, and asking for prompt advices as to whether it would install the engine or make suitable allowance. The Ship Sales Division wrote in reply on December 12, 1925:

"We have for acknowledgment your letter of December 10th, subject of which was covered by our telephone discussion at the time of delivery of the tug Ballenas. We regret that the circumstances in this case caused you to be misled as to this tug. As we informed you during our telephonic discussion, we are having an investigation made to determine if there is available in the Board's warehouse a towing engine suitable for the Ballenas and if so, we shall undertake to obtain authority to deliver the same to you free of charge. We hope to communicate with you further shortly."

On January 26, 1926, the Hedger Company was advised by letter as follows:

"We have been unable to locate a towing engine which might be delivered for installation on the Ballenas and there appears nothing which we can do along such lines.

"We would suggest that you submit a proposal covering your idea of a proper settlement in the matter and we shall be glad to take the matter up for consideration and decision."

Finally, after further correspondence and interviews, the department declined to do anything and the Hedger Company brought this suit, and I think it is entitled to recover.

■ There is convincing evidence that the cost of the engine and installation amounts to about $18,300, and there is also satisfactory evidence that the Ballenas was worth $12,000 less without a towing engine than she would have been if equipped with one. However, petitioner's recovery under the Tucker Act (28 USCA § 41(20) is limited to $10,-000, and as petitioner by its prayer for relief waived its right to recover a sum greater than that, the court has jurisdiction to make an award in that amount. Hill v. United States (C. C.) 40 F. 441.

Accordingly, petitioner may have a decree for that amount.